**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:

| | | |
|---|---|---|
| Christopher E. Saunier, | ) | Case No. 6:07-bk-01667-ABB |
| | ) | Chapter 7 |
| Debtor. | ) | |

| | | |
|---|---|---|
| Christopher E. Saunier, | ) | |
| | ) | |
| Plaintiff, | ) | A.P. No. 6:07-ap-00073-BGC |
| | ) | |
| vs. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The matter before the Court is the Debtor's <u>Complaint to Determine Dischargeability of Taxes</u> filed on June 14, 2007.  A.P. Docket No. 1.[1]

After notice, a trial was held on May 17, 2012. Appearing were: the Debtor, his attorney Kevin Gleason, and Michael May, the attorney for the Internal Revenue Service as the Defendant United States of America.

**I.  The Issue**

The sole issue before the Court is whether the Debtor's admittedly due but not paid federal income taxes and interest for 1999, 2000, and 2001 should be excepted from discharge pursuant to section 523(a)(1)(C) of the Bankruptcy Code.  Before those taxes and interest may be excepted, that section requires proof that the Debtor, "willfully attempted in any manner to evade or defeat..." payment of his taxes. 11 U.S.C. § 523(a)(1)(C).

---

[1] This proceeding was reassigned to the undersigned on August 24, 2011.  A.P. Docket No. 18.

## II. The Parties' Contentions

### A. The Debtor

The Debtor contends that his efforts to pay the taxes, both directly and in the form of offers of compromise, demonstrate that he did not willfully attempt to evade payment. The Debtor concludes that his tax debts are dischargeable.

### B. The IRS

The IRS disagrees and asserts that the Debtor's tax liabilities for 1999, 2000, and 2001 are nondischargeable because the Debtor willfully attempted to evade payment of his taxes.  Primarily, the IRS contends, in addition to the fact that the Debtor did not pay his taxes, that the Debtor intended to evade payment of his taxes:  (1) when he presented unreasonable offers to the IRS to settle his tax liabilities; and (2) when he spent over $28,000 buying and restoring a "vintage" car, rather than paying his taxes.

The IRS concludes that the Debtor's tax debts are nondischargeable pursuant to Section 523(a)(1)(C) because the Debtor willfully attempted to defeat paying his taxes.

## III. Findings of Fact

### A. Background

The Debtor filed the pending Chapter 7 case on April 26, 2007. The Court granted the Debtor's discharge on August 17, 2007.

Federal income tax debts for the tax years 1999, 2000, and 2001 are at issue.  The Debtor admits he owes outstanding income tax liabilities for these tax years. The IRS admits that any penalties associated with those liabilities are dischargeable.

### B. The Debtor's Wife's Income

The Debtor and his wife Paula Saunier have been married for twenty years.  While Mrs. Saunier was once employed as a public school teacher, she did not work outside the home during 1999 through 2001, the years under review. She was a homemaker caring for the couple's two minor children. Consequently, all of the earned income reported on their federal income tax returns for 1999, 2000, and 2001 is attributable to the Debtor.

2

### C.  The Debtor's Business

The Debtor was the sole shareholder of C.P.S. and Company, Inc., a Florida corporation with offices in Winter Park, Florida. The Debtor formed it in 1998. The Debtor sold computer hardware and provided computer consulting services through CPS. CPS received a percentage of sales as commissions. The Debtor was the only employee of CPS, and the evidence was clear that he was a sophisticated businessman.

### D.  The Debtor's Income
### and Tax Liabilities

The Debtor took a portion of each commission from CPS as either salary or draws and deposited those funds into a SunTrust bank account owned jointly with his wife.  All of the funds taken from CPS by the Debtor constituted income. The Debtor knew he was required to make quarterly estimated tax payments to the IRS because of his self-employed status.  He did not make those payments consistently during the tax years at issue; however, at times, he accumulated funds in the SunTrust account to make a lump sum payment for his tax liabilities when he filed his return the next year.

The Debtor acknowledged he had a duty to file federal income tax returns for tax years 1999, 2000, and 2001, and he had a duty to pay taxes for those tax years. A tax attorney firm located in Coral Gables, Florida, prepared federal income tax returns for the Debtor.

The Debtor was financially successful in 1998 and 1999.  He and his wife filed a joint federal income tax return for tax year 1998.[2]  Their income was $760,034. That income consisted primarily of the Debtor's CPS income of $572,872  and capital gains of $106,283 from his investments.[3] The Debtor was heavily invested in technology stocks.

The Saunier's tax liability for 1998 was $276,653, from which $53,955 was deducted for tax payments (including $40,000 paid with a Form 4868 extension request), resulting in a tax liability of $223,901.[4]  The Debtor listed an estimated tax penalty of $1,203 on his 1998 return at Line 69 because he failed to file the return by April 15, 1999.

---

[2] IRS Exhibit No. 1.

[3] IRS Exhibit No. 1.

[4] IRS Exhibit No. 1.

The Debtor obtained an extension of the April 15, 1999, filing deadline for the 1998 tax return. He filed the 1998 tax return within the extension period and paid in full the outstanding tax liability balance of $223,901 in 1999.[5]

Calendar year 1999 was another financially successful year for the Debtor, but that is the year his tax problems began.

The Debtor reported taxable income of $1,070,898 on his 1999 tax return and tax due of $409,691.[6] Because the Debtor paid his 1998 tax liability from his 1999 income, he lacked funds to pay the 1999 tax liability in full. He did not make any payments on the 1999 liability in 1999, but he paid $109,334 towards it in 2000.[7] The Debtor made additional payments of $11,000 in 2005 and $2,000 in 2006 towards the 1999 liability.[8]

The Debtor's income dropped significantly in 2000 and 2001.[9] The Debtor filed his tax year 2000 tax return on January 18, 2002, and reported taxable income of $215,851 for 2000 with a tax liability of $71,800.[10] The Debtor paid $6,976 of that liability on April 15, 2001.[11] He did not make any other payments for the 2001 tax liability.

The Debtor filed his tax year 2001 tax return on September 16, 2002, and reported taxable income of $96,829 with a tax liability of $25,747.[12] The Debtor made an estimated tax payment of $7,500 for tax year 2001 on or about January 18, 2002.[13] He did not make any other payments for the 2001 tax liability.

The IRS has been assessing penalties and interest for the outstanding 1999, 2000, and 2001 tax liabilities. At trial, the Debtor owed a considerable

---

[5] IRS Exhibit No. 1.

[6] IRS Exhibit No. 10.

[7] IRS Exhibit No. 10.

[8] IRS Exhibit No. 10.

[9] IRS Exhibit Nos. 4 and 7.

[10] IRS Exhibit No. 11.

[11] IRS Exhibit No. 11.

[12] IRS Exhibit No. 12.

[13] IRS Exhibit No. 12.

amount of unpaid taxes, penalties, and interest for those tax years.  While the exact amount was not fixed, there is no question that it was near $800,000.[14]

## E.  The Debtor's Offers in Compromise to the IRS

The Debtor hired a tax adviser in 2001 to assist in resolving his income tax liabilities. Through that adviser, the Debtor made offers in compromise to the IRS. While the IRS rejected all offers, it made some counteroffers and suggestions.

The Debtor made his first offer on January 29, 2002.  He offered $14,600 to compromise his $400,000, 1999 tax liability.[15]  He amended that offer on April 16, 2002, to include his 2000 and 2001 liabilities, but he did not increase the offer.[16] Both offers were, of course, rejected; however, the parties continued to negotiate.[17]

The Debtor offered $66,000.[18] The IRS did not accept that offer.[19] The IRS did, however, suggest to the Debtor that he make an offer of $163,160. The Debtor responded with a counteroffer of $103,160. The IRS rejected that offer, but rather than countering between the Debtor's $103,160 offer and the suggested offer of $163,160, the IRS added $117,840 to $163,160 and made an offer of $281,000. The Debtor then counter offered $180,000, or $16,840 more than the IRS's $163,160 amount. The IRS rejected that offer.

During the negotiations, based upon the advice of his tax advisor, the Debtor obtained an equity line of credit for his home with the intent of borrowing funds to settle his tax debt. The Debtor owned the home as a tenant by the entirety with his wife.

---

[14] That amount includes the penalties which the IRS concedes are dischargeable pursuant to 11 U.S.C. § 523(a)(7)(B) and are due to be discharged.

[15] IRS Exhibit No. 6.

[16] IRS Exhibit No. 2.

[17] IRS Exhibit Nos. 10, 11, and 12 and Debtor Exhibit Nos. 39 and 40. In regard to the exhibit numbers, the Debtor submitted six exhibits. Those were numbers 37 through 42. The Debtor did not identify or offer any exhibits numbered 1 through 36 but simply selected the next exhibit number after IRS exhibit number 36.

[18] Debtor Exhibit No. 39. There may have been offers before this one that were not specifically identified.

[19] Debtor Exhibit No. 39. There is no documentary evidence of a specific rejection; however, it is clear that the IRS was not going to accept the offer.

**F.  The Debtor's Alleged Misuse of His Income**

The parties' primary disagreement as to whether the Debtor willfully evaded paying his taxes revolves around the Debtor's purchase of a "vintage" automobile during the time he should have been resolving his tax issues.  The facts are not complicated, although the parties characterize them differently.

While engaged in offer in compromise negotiations with the IRS, the Debtor traveled to California in 2000 and bought a 1970 Buick GS, which has been characterized as a rare classic car and described as a "muscle car."[20]  The Debtor paid $14,500 for the Buick and had it shipped to Florida.

The Debtor testified he bought it as a gift for his wife.  Mrs. Saunier was not involved in the purchase transaction and did not recall the purchase price. In addition, she did not remember executing the application for the Certificate of Title.[21] In contrast, the car's State of Florida Certificate of Title dated November 10, 2000, lists Mrs. Saunier as the individual title holder.[22]

Because the Buick was in poor condition when the Debtor purchased it, he hired a restoration specialist in Minnesota.[23]  The Debtor spent between $16,000 and $20,000 restoring the car.[24]  The restoration took two years after which it was shipped to the Debtor in Florida in 2002. Mrs. Saunier did not have any substantive involvement in the restoration of the Buick as it was handled almost exclusively by the Debtor.

The Debtor and his wife exhibit the Buick from time to time at weekend car shows. The Debtor is the primary driver.  Mrs. Saunier has driven it only once or twice.  In his Statement of Financial Affairs, the Debtor valued the car at $70,000. Case Docket No. 13.

---

[20] IRS Exhibit No. 33.

[21] IRS Exhibit No. 33.

[22] IRS Exhibit No. 34.

[23] IRS Exhibit Nos. 18-25.

[24] IRS Exhibit No. 36.

## IV.  Conclusions of Law

## A.  Procedural Matters

At the opening of the trial, the Debtor made an <u>ore tenus</u> motion to exclude all of the IRS's evidence pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure. The Debtor asserted that the IRS failed to raise any affirmative defenses timely, in particular, the allegation that the Debtor willfully evaded collection.

In response, the IRS made an <u>ore tenus</u> motion to amend its Answer, A.P. Docket No. 7, pursuant to Rule 15 of the Federal Rules of Civil Procedure 15 and Rule 7015 of the Federal Rules of Bankruptcy Procedure. Specifically the IRS asked to include the allegation that the Debtor willfully attempted to evade paying his tax liabilities.

In open court, the Court granted the IRS motion. While the IRS did not raise any affirmative defenses in its Answer, or allege that the Debtor willfully attempted to evade paying his tax liabilities, as early as April 2008 in its discovery responses, the IRS alleged the Debtor willfully evaded collection of the tax liabilities.  Consequently, the Debtor was on notice since April 2008 that Section 523(a)(1)(C) was at issue in this adversary proceeding.  He had ample time, that is more than four years, to prepare a rebuttal.

The Debtor made a second <u>ore tenus</u> motion requesting the evidentiary record be left open for the Debtor to present rebuttal evidence as to the IRS's Section 523(a)(1)(C) allegations. That motion is moot as the Debtor presented rebuttal evidence at trial regarding the Section 523(a)(1)(C) allegations.

## B.  Substantive Issues

The opinion of the Court of Appeals for the Eleventh Circuit in <u>United States v. Mitchell</u>, 633 F.3d 1319 (11th Cir. 2011) defines: (1) the applicable law; (2) the burden of proof; and (3) what test this Court should apply.[25]

---

[25] In addition to <u>In re Mitchell</u>, A.P. No. 08-4006, 2009 WL 1370996 (Bankr. M.D. Ga. May 14, 2009) (opinion by Bankruptcy Judge James D. Walker, Jr.), aff'd  <u>U.S. v. Mitchell</u>, Case No. 4:09-CV-79 , 2009 WL 4893591 (M.D. Ga. Dec 09, 2009), rev'd  <u>In re Mitchell</u>, 633 F.3d 1319 (11th Cir. 2011), the evolution of the law in this Circuit on this point is well documented. See:

> <u>In re Griffith</u>, 161 B.R. 727 (Bankr. S.D. Fla. 1993) (opinion by Bankruptcy Judge Erwin I. Katz), aff'd <u>In re Griffith</u>, 210 B.R. 216 (S.D. Fla. 1997), rev'd <u>In re Griffith</u>, 174 F.3d 1222 (11th Cir. 1999), rehearing en banc granted, opinion vacated <u>In re Griffith</u>, 182 F.3d 1297 (11th Cir. 1999), on rehearing en banc  <u>In re</u>

## 1. The Applicable Law

Writing for the Court, Judge Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation, first explained, and put in proper context, the applicable law. She wrote:

> A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition. See 11 U.S.C. § 727(b). However, "this 'fresh start' policy is only available to the 'honest but unfortunate debtor.' " Fretz, 244 F.3d at 1326 (quoting Grogan v. Garner, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991)). To ensure that only the honest but unfortunate debtors receive the benefit of discharge, Congress enacted several exceptions to § 727(b)'s general rule of discharge.

---

> Griffith, 206 F.3d 1389 (11th Cir. 2000) cert. denied  Griffith v. U.S., 531 U.S. 826 (2000);

> In re Fretz, 239 B.R. 605 (Bankr. N.D. Ala. 1999) (opinion by Bankruptcy Judge Jack Caddell) aff'd U.S. v. Fretz, 248 B.R. 183 (N.D.Ala. 2000), rev'd In re Fretz, 244 F.3d 1323 (11th Cir.  2001); and

> In re Jacobs, 324 B.R. 376 (Bankr. M.D. Fla. 2005) (opinion by Bankruptcy Judge George L. Proctor), rev'd In re Jacobs, Case No. 03-07148BKC3P7, 2006 WL 2691516 (M.D. Fla. Sep 19, 2006), aff'd In re Jacobs, 490 F.3d 913 (11th Cir. 2007).

In addition, other cases from the Bankruptcy Court for the Middle District of Florida include:

> In re Rhodes, 356 B.R. 229 (Bankr. M.D. Fla. 2006) (opinion by Bankruptcy Judge Arthur Briskman);

> O'Callaghan  v. United States (In re O'Callaghan), 316 B.R. 550 (Bankr. M.D. Fla. 2004) (opinion by Bankruptcy Judge Paul Glenn);

> Kight v. Dep't of Treasury (In re Kight), 460 B.R. 555 (Bankr. M.D. Fla. 2011) (opinion by Bankruptcy Judge Jerry Funk); and

> In re Obinwa, Case No. 6:11–bk–08951, 2012 WL 5555715 (Bankr. M.D. Fla. Nov. 13, 2012) (opinion by Bankruptcy Judge Karen Jenneman).

For a discussion of the earlier history of this issue in the Eleventh Circuit, see  In re Haas, 48 F.3d 1153 (11th Cir.(Ala.) Mar 30, 1995), the Eleventh Circuit Court's consideration of one of the two appeals from the district court's reversal of the decision of Judge Arthur Briskman, then sitting as a bankruptcy judge in the Southern District of Alabama.

The exception at issue in this case is contained in 11 U.S.C.
§ 523(a)(1)(C), which provides, in relevant part:

> (a) A discharge under section 727 ... of this title does not discharge
> an individual debtor from any debt—
>
> > (1) for a tax or a customs duty—
> > ....
> > > (C) with respect to which the debtor made a
> > > fraudulent return or willfully attempted in any manner
> > > to evade or defeat such tax.

11 U.S.C. § 523(a)(1)(C).

Id. at 1326-27.[26]

## 2.  The Burden of Proof

Second, Judge Bucklew explained the burden of proof. She wrote:

> "The Government bears the burden to prove, by a preponderance
> of the evidence, that a particular claim is nondischargeable under
> § 523(a)." In re Griffith, 206 F.3d 1389, 1396 (11th Cir.2000) (en
> banc) (citing Grogan, 498 U.S. at 287–88, 111 S.Ct. at 659–60).
> Furthermore, exceptions to the general rule of discharge, such as
> § 523(a)(1)(C), are to be strictly construed in favor of the debtor.
> Fretz, 244 F.3d at 1327.

Id. at 1327.

## 3.  What Test This Court Should Apply

Third, Judge Bucklew identified the two-part test the Eleventh Circuit
requires this Court to apply. She wrote:

---

[26] As quoted, subsection (C) applies both when a debtor files a fraudulent return and
when a debtor willfully attempts to evade paying taxes. Only the latter applies in this
proceeding. There is no evidence that the Debtor filed a fraudulent tax return. Therefore
this Court will consider only whether the Debtor, "willfully attempted in any manner to
evade or defeat such tax...." Id. See Mitchell a 1327 ("Mitchell did not file a fraudulent
return in this case, so we only look to the second part of § 523(a)(1)(C)—whether
Mitchell willfully attempted in any manner to evade or defeat such tax—to determine the
dischargeability of his past due taxes for 1998 to 2002.")

This Court has set forth a two-prong test for determining whether a
debtor has willfully evaded his taxes pursuant to § 523(a)(1)(C),
which requires proof by the Government that the debtor engaged in
(1) evasive conduct with (2) a mental state consistent with
willfulness. See Jacobs, 490 F.3d at 921; Fretz, 244 F.3d at 1327.

Id. at 1327.

Courts in the Eleventh Circuit commonly label part (1) of this two-part test
as the "conduct requirement" and part (2) as the "mental state requirement."[27]
Bankruptcy Judge Jerry Funk's description of each in In re Ryals, 424 B.R. 539
(Bankr. M.D. Fla. 2009) is very helpful. He wrote:

Conduct Requirement of § 523(a)(1)(C)

With regard to the conduct element, "the plain statutory
language simply requires that the debtor have 'attempted in any
manner to evade or defeat tax.' " Fretz, 244 F.3d at 1329
(emphasis added) (internal citation omitted). While something more
than simply failing to pay taxes is required, In re Haas, 48 F.3d
1153, 1155–1158 (11th Cir.1995), the government can satisfy the
conduct requirement by showing that a debtor engaged either in
acts of commission or culpable acts of omission to avoid payment
or collection of taxes. In re Jacobs, 490 F.3d 913, 921 (11th
Cir.2007). There are myriad fact patterns in which courts have
concluded that acts or omissions, coupled with the failure to pay
taxes, satisfy the conduct requirement of § 523(a)(1)(C).

Mental State Requirement of § 523(a)(1)(C)

In order to satisfy the mental state requirement, the
government must prove that a debtor: (1) had a duty to file income
tax returns and pay taxes; (2) knew he had such a duty; and (3)
voluntarily and intentionally violated that duty. Fretz, 244 F.3d at
1330 (citing In re Griffith, 206 F.3d 1389, 1396 (11th Cir.2000)).
"The third or willfulness component of the mental state requirement
'prevents the application of the exception to debtors who make
inadvertent mistakes, reserving nondischargeability for those
whose efforts to evade tax liability are knowing and deliberate.' "
Fretz, 244 F.3d at 1330 (quoting In re Birkenstock, 87 F.3d 947,
952 (7th Cir.1996)). However, in order to show that a debtor

---

[27] Part (2) may also be referred to as "willfulness." See O'Callaghan  v. United States (In
re O'Callaghan), 316 B.R. 550, 554-55 (Bankr. M.D. Fla. 2004)

voluntarily and intentionally violated his duty to pay, it is not
necessary to establish fraudulent intent. <u>In re Jacobs</u>, 490 F.3d at
924.

<u>Id</u>. at 543-44.

### 4.  Summary of the Law

Bankruptcy Judge Arthur Briskman offered this concise summary of the
above in <u>Rhodes v. United States of America (In re Rhodes)</u>, 356 B.R. 229
(Bankr. M.D. Fla. 2006):

> The United States must establish non-payment was an intentional
> and voluntary attempt by the Plaintiff to evade or defeat the tax
> liability. The government must meet a two-step test. Step one, the
> conduct test, requires the government to prove the debtor acted in
> a manner designed to evade or defeat tax liability. Step two, the
> mental state requirement, examines the debtor's willfulness. <u>Griffith</u>,
> 206 F.3d at 1396. As to the mental state test, the government must
> establish: (1) the debtor had a duty to pay income tax; (2) the
> debtor knew he had such a duty; and (3) the debtor voluntarily and
> intentionally violated that duty. <u>Griffit</u>h, 206 F.3d at 1396 (citing
> <u>Matter of Bruner</u>, 55 F.3d 195, 197 (5th Cir.1995)); <u>Matter of
> Birkenstock</u>, 87 F.3d 947, 952 (7th Cir.1996). A willful act is one
> done voluntarily, consciously or knowingly, and intentionally. <u>Sly v.
> United States</u>, 318 B.R. 194, 203 (N.D.Fla.2004); <u>Landi v. United
> States</u>, 316 B.R. 363, 366 (M.D.Fla.2004).

<u>Id</u>. at 236.

### 5.  Application of the Law to the Facts

This Court is reminded that, "Exceptions to the general rule of discharge,
such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor." <u>In re
Fretz</u>, 244 F.3d 1323, 1327 (11th Cir. 2001) (citations omitted). It applies this
Circuit's two-part test in that light.

### a.  Part One - The Conduct Component

As a preliminary note, "the conduct requirement of § 523(a)(1)(C) is not
satisfied where a debtor has filed accurate returns and simply failed to pay
taxes...." <u>O'Callaghan  v. United States (In re O'Callaghan)</u>, 316 B.R. 550, 555
(Bankr. M.D. Fla. 2004). That is the situation here. Consequently, as to the
conduct requirement, this Court has considered only whether the debtor's,
"<u>remaining</u> conduct amounts to more than a mere failure to pay." <u>Kight v. Dep't of</u>

Treasury (In re Kight), 460 B.R. 555, 562 (Bankr. M.D. Fla. 2011) (emphasis added).

As stated above, the core of the IRS's contention that this Debtor willfully attempted to evade his tax liabilities involves the Debtor's purchase and restoration of a 1970 Buick. The IRS contends that spending about $28,000 of discretionary funds on a "vintage" automobile while owing a considerable amount of taxes and while being engaged in offers in compromise with the IRS, was a willful evasion of payment of the taxes. As stated above, the facts regarding the Buick are not complicated, but the parties characterize them differently.

The Debtor was engaged in offer in compromise negotiations when he went to California in 2000 and bought a 1970 Buick GS. The Debtor paid $14,500 for the car and had it shipped to Florida. For the next two years, the Debtor left the car with a restoration specialist in Minnesota. The Debtor paid between $16,000 and $20,000 for this restoration. After the restoration, the car was shipped back to the Debtor in Florida in 2002.

Mrs. Saunier did not have any substantive involvement in the restoration of the Buick. And while the Debtor testified he bought it for his wife as a gift, the facts show that he is the primary driver, and she rarely drives it. In contrast, the car's certificate of title is in her name.

The Buick is clearly something the Debtor has for fun rather than utilitarian purposes. He values it at about $70,000, and the couple exhibit it at car shows on some weekends. But the question this Court must ask is: Is spending $28,000 to buy and restore an automobile conduct that may be characterized as avoiding payment of taxes, where maybe $800,000 in taxes are due?

The IRS relies heavily on United States v. Mitchell (In re Mitchell) 633 F.3d 1319 (11th Cir. 2011) in support of its contention that this Debtor should not have spent about $28,000 in discretionary funds. This Court cannot find that the two cases are comparable. The base facts are quite different and distinguishable. In Mitchell the debtor made discretionary expenditures of more than $115,000. In contrast, the debtor here spent about $28,000.  Such an amount, while not insignificant, does not rise to the level of the expenditures made in Mitchell.

Other than the car, little else of the Debtor's "conduct" is contested, although the parties do not agree on how that conduct should be viewed. There is no question that the Debtor did not pay all his taxes. There is no question that he did not pay quarterly estimates as he was required to do. And, there is no question that the Debtor took out an equity line of credit on his house. But are these actions objectionable conduct? There is no evidence that they are.

The Debtor was the sole income earner during the period under review. His wife did not earn an income during 1998 through 2001 as she was a homemaker caring for their two minor children. Consequently, all of the income reported on the Debtor's income tax returns for tax years 1998 through 2001 was earned by the Debtor.

The Debtor, on the other hand, owned a corporation that sold computer hardware and provided computer consulting services, at which he did very well. The Debtor was financially successful in 1998 and 1999. He and his wife had income of $760,034 in 1998, which included $106,283 of capital gains. Their income in 1999 was $1,070,898. In 1998, they owed taxes of $276,653, from which $53,955 was deducted for tax payments (including $40,000 paid with an extension request), resulting in a tax liability of $223,901. A tax penalty of $1,203 was added for not filing timely. After an extension, the Debtor paid the outstanding $223,901.

From his $1,070,898 income in 1999, the Debtor had taxes due of $409,691. Because he had spent his 1999 income paying the 1998 tax debt, he could not pay this amount. He did, however, pay $109,334 in 2000, $11,000 in 2005, and $2,000 in 2006 on the 1999 debt.

The Debtor made significantly less in 2000 and 2001.  He had a tax debt of $71,800 on income of $215,851 for 2000 and a tax debt of $25,747 for income of $96,829 in 2001. He paid $6,976 on April 15, 2001, for the 2000 debt and paid $7,500 on or about January 18, 2002, for the 2001 debt.

At trial, the Debtor still owed hundreds of thousands of dollars in unpaid taxes, penalties, and interest.

Based on these facts, the Court cannot find that the IRS met its burden of proof as to the conduct requirement. Yes, the Debtor made some bad decisions, but those decisions were not affirmative acts to avoid paying taxes. Judge Briskman reminds us that the, "typical case of non-dischargeable tax liability pursuant to § 523 of the Bankruptcy Code often involves debtors who fail to file tax returns, pay no withholding, fail to make payroll taxes, or live a lavish lifestyle they cannot afford, all while making no effort to satisfy their tax liability." Rhodes at 356 B.R. 235. That is not the situation here.

The Debtor filed his tax returns. He paid some estimated taxes, although untimely. There is no evidence that he lived a lavish lifestyle. And during the entire time he was negotiating with the IRS he was attempting to pay his taxes. What the Debtor should not have done was spend money on a car that certainly he could have lived without. But does that make the totality of his conduct evasive? This Court does not believe that it does.

13

More factors weigh in the Debtor's favor than the IRS. Consequently, the Court finds, as to the "conduct component," the IRS did not establish by a preponderance of the evidence that the debtor acted in a manner to evade or defeat tax liability.[28]

### b.  Part Two - The Mental or Willingness Component

The second part of the Eleventh Circuit's two-part test is whether the Debtor voluntarily and intentionally violated his duty to pay his taxes. As stated above, to succeed, the IRS must prove that the Debtor, "(1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty." In re Fretz, 244 F.3d at 1330.

Because the Debtor admits that he knew he had a duty to file returns and pay taxes, all that remains is whether the IRS proved that the Debtor voluntarily and intentionally violated the duties he acknowledges. Based on the evidence, the Court finds that it did not.

### (1) The Debtor Continued to Pay

First, while the Debtor did not pay anything near to what he owed, he did continue to pay something. He had taxable income of $1,070,898 for 1999 with taxes due of $409,691. While he did not make any payment on this liability in 1999, he paid $109,334 towards it in 2000, $11,000 in 2005, and $2,000 in 2006.

The Debtor had taxable income of $215,851 for 2000 with taxes due of $71,800. He paid $6,976 on that debt on April 15, 2001.

The Debtor had taxable income of $96,829 and a tax liability of $25,747 for 2001. He made an estimated tax payment of $7,500 for tax year 2001 on or about January 18, 2002.

### (2) The Debtor Continued to Negotiate

Second, while the Debtor continued to pay something toward his IRS debt, he exercised his right to attempt to compromise it. Like the debtor in In re O'Callaghan, 316 B.R. 550 (M.D. Fla. 2004), this Debtor did not try to "'hide' from

---

[28] Because the IRS must satisfy both parts of the Eleventh Circuit two-part test, where the Court has found that part one was not satisfied, technically, it may be unnecessary for the Court to consider part two, (see Kight v. Dep't of Treasury (In re Kight), 460 B.R. 555, 564-65 (Bankr. M.D. Fla. 2011)); however, given the nature of this proceeding, the Court finds it practically reasonable to do so.

the IRS or ignore its system. Instead, the Debtor hired professionals and utilized the procedures established by the IRS to defend and challenge the tax claim." Id. at 557.

The Debtor's first offer was $14,600. The IRS offered this description of the negotiations. It wrote:

> In late 2001 or early 2002, Saunier retained J.K. Harris & Co. to help resolve his unpaid income tax liabilities. (Trial Tr. I:130.) To decrease the amount he might have to pay in an offer in compromise submitted to the IRS, Saunier took out a home equity loan designed to reduce his visible net worth. (Trial Tr. I:130-131.) Once Saunier successfully encumbered his home, Saunier offered the IRS $14,600 to compromise his $400,000 liability for 1999. (Trial Tr. I:132;Exs. 6, 5.) At trial, Saunier characterized the offer as "ridiculous," admitted he knew that at the time he made it, and testified that the offer was nothing more than a "slap in the face" to the IRS. (Trial Tr. I: 132, 137.) Shortly after that initial offer, Saunier added insult to injury by amending the offer to include the liability he reported on his return for 2000, as well as the liability he had not yet reported for 2001. (Trial Tr. I: 135, 136, 137; Ex. 2.) Saunier did not increase the amount he was offering to satisfy those debts, however, and the IRS declined to accept such a paltry offer from a taxpayer who earned in excess of $1 million in 1999, and reported over $200,000 in taxable income on his 2000 return. (Trial Tr. I: 138; Exs. 2, 6, 10.)

> After the IRS informed him the amended offer was unacceptable, Saunier made several other offers to compromise his liabilities. (Trial Tr. I:139; Exs. 10, 11, 12.) None offered to pay what the IRS determined Saunier could afford, and all were rejected on that basis. (Exs. 10, 11, 12, 39, 40.) For example, when the IRS informed Saunier it would consider an offer of $163,000, he offered $103,000. (Trial Tr. II:60; Exs. 39, 40.) After informing Saunier that $103,000 would not be acceptable and an offer of $281,000 was more in-line with his financial circumstances, Saunier offered to pay $180,000. (Trial Tr. II:63, 67; Exs. 5, 10, 11, 12, 40.) With this game of cat and mouse, Saunier was able to prevent the IRS from levying or taking other steps to collect his unpaid liabilities. (Trial Tr. I:37.)

United States' Post-Trial Brief, A.P. Docket No. 40 at 4-5, June 14, 2012
(footnote omitted).[29]

The Debtor's offer of $14,600 was of course rejected, but as low as it was, the IRS must have thought that some kind of settlement was possible because like the Debtor, it continued to negotiate.

At some point after his $14,600 offer was rejected, the Debtor offered $66,000. The IRS did not accept this offer.[30] Part of a December 13, 2002, letter from revenue officer K. Morton to the Debtor explains those events. It reads:

> We received your amended offer in compromise in the amount of $66,000. Our review of the information available at this time reflects that we will not be able to recommend this offer for acceptance because it does not include the value of equity in your assets and future income potential. We suggest that you amend your offer to an amount equal to $163,160.00 AND add a future income collateral agreement to take into account the possibility that your future income may be higher than your current income. Please note that this is NOT an offer to settle your account for the amount mentioned. Further verification and information will be necessary before we can recommend the exact amount that is likely to be accepted.

Debtor Exhibit No. 39.

The exhibit goes on to explain in detail why the IRS suggested that the Debtor offer $163,160.

Rather than offering $163,160 as the IRS suggested, the Debtor made a counteroffer of $103,160.[31] The IRS rejected that offer.[32]

---

[29] According to IRS Exhibit Nos. 10, 11, and 12, the parties did eventually enter into an "Installment Agreement" on June 9, 2005.  The IRS contends the Debtor defaulted on that agreement.

[30] Debtor Exhibit 39 does not reflect that the IRS actually rejected the offer but refers only to plans not to recommend it for acceptance. But it is clear from the exhibit that the IRS was not accepting this offer.

[31] Debtor Exhibit 40.

[32] Debtor Exhibit 40.

A narrative attached to the letter in Debtor Exhibit No. 40 includes the IRS explanation for rejecting $103,160. The section titled "Factors Supporting Rejection" reads:

> The TP has not offered an amount which represents the RCP in this case. TP has failed to include a component in his offer which represents his future income potential and equity in assets. He continues to maintain a lifestyle which prevents him from satisfying his debt tot he [sic] government. He is not making the choices necessary to resolve the tax debt.
>
> TP failed to make the required estimated tax payments due on his self employment income. There are no apparent special circumstances in this case. Although TP claims he has some health issues there is no evidence that the health problems create any economic problems.
>
> In addition, this TP has taken proactive steps to liquidate equity in assets while failing to use the funds to pay past due taxes. The offer appears to be a premature attempt to solve the debt without considering other collection options, such as installment agreement.
>
> There are potential under reporting issues for 2000 and 2001. TP avoided tax by failing to report wages and/or self employment income related to income he received for those years from his corporation.

Debtor Exhibit No. 40.[33]

Rather than making a counter offer between $103,160 and $163,160, or even offering $163,160, the IRS added $118,131 to its $163,160 "suggested" offer and demanded $281,291. An April 23, 2003, letter from Thomas L. Weber with the IRS to the Debtor offers the IRS's explanation of why. It reads:

> We have investigated your offer dated 12/30/2002 in the amount of $103,160.00.  A copy of your offer is enclosed.
>
> We are rejecting the offer for the following reason(s):

---

[33] See note 29 above.

The amount offered is less than your reasonable collection potential. Copies of worksheets showing our calculations are enclosed for your review.

If you agree to increase your offer to $281,291.00, we will recommend acceptance. That recommendation is subject to additional review and approval.

Debtor Exhibit No. 40.

The Debtor made a final offer of $180,000, which was $16,840 greater than the IRS' suggested offer of $163,160. The IRS rejected $180,000.

In terms of the test this Court must apply, this Court cannot find that the IRS proved that the Debtor, "voluntarily and intentionally violated..." his duty to pay taxes. The Debtor offered to pay $180,000, or $16,840 more than the IRS's $163,160 amount.[34] Apparently the lesser amount of $163,160 was reasonable at some time, although one for $16,840 more was not considered so by the IRS when it was offered.[35] The Court cannot reconcile these differences. In contrast, the fact that the Debtor offered the higher amount is evidence this Court must acknowledge as being contrary to a voluntary or intentional violation of the duty to pay taxes. The Debtor either willfully evaded payment of his taxes or made a reasonable offer to pay them. He cannot be found to have done both. This Court finds that it is the latter.

Again, the Court finds that more factors weigh in the Debtor's favor than the IRS. Consequently, the Court finds, as to the "mental component," the IRS

---

[34] As stated above, Debtor Exhibit 39 explains in detail how the IRS reached the $163,160 figure, although, a specific document referred to in the letter is not attached in the exhibit.

[35] The IRS offer on the table was $281,291. Why did the IRS calculation of "minimum reasonable collection potential" change so drastically? The Court accepts the IRS proviso in its December 13, 2001, letter regarding the $163,160 amount that, "further verification and information will be necessary before we can recommend the exact amount that is likely to be accepted." Debtor Exhibit No. 39. But less than five months later, the IRS calculated the "minimum reasonable collection potential" to be $281,291, or $118,131 higher. One explanation may be that the real estate equity amount associated with $163,160 was $100,000 (Debtor Exhibit No. 39) and the amount associated with $281,291 was $150,000 (Debtor Exhibit 40), but that would explain only about $50,000 difference. The Court presumes that the expenses referred to in Exhibit 39 and the equity referred to in Exhibit 40 may explain the rest.

did not establish by a preponderance of the evidence that the Debtor intentionally and voluntarily violated his acknowledged duties to file tax returns and pay taxes.

## V.  Conclusion

Based on the above, the Court concludes that the Debtor's federal income taxes and interest for 1999, 2000, and 2001 should not be excepted from discharge pursuant to section 523(a)(1)(C) of the Bankruptcy Code.

The IRS did not establish by a preponderance of the evidence with respect to tax years 1999, 2000, and 2001 that the Debtor, "willfully attempted in any manner to evade or defeat..." payment of his taxes. 11 U.S.C. § 523(a)(1)(C). Consequently, any and all tax liabilities, interest, and penalties relating to the Debtor, either individually or jointly, for tax years 1999, 2000, and 2001 are dischargeable.

Judgment is therefore due to be entered in favor of the Debtor and against the IRS.

A separate Order will be entered contemporaneously with this Memorandum Opinion.

Dated: March 12, 2013          /s/Benjamin Cohen_____
                               BENJAMIN COHEN
                               United States Bankruptcy Judge

BC:pb